ROBERT TRUMAN THORPE, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
THORPE v. COMMISSIONER
Docket No. 30337-89.
United States Tax Court
T.C. Memo 1992-160; 1992 Tax Ct. Memo LEXIS 163; 63 T.C.M. (CCH) 2448; March 19, 1992, Filed *163 Decisions will be entered under Rule 155. Robert Truman Thorpe, pro se. Christine V. Olsen, for respondent. JACOBS
JACOBS
MEMORANDUM OPINION JACOBS, Judge: Respondent determined deficiencies in petitioner's Federal income tax as follows: Additions to Tax
Sec.
Sec.
Sec.
Sec.
Year
Deficiency
6651
6653
6653(a)
6661
(a)(1)
(a)(1)
(1)(A)
1983
$  55,887
$ 14,055
[1] $ 2,961
$ 13,972
1986
243,508
[2] $ 12,175
60,877
The issues for decision are: (1) Whether petitioner realized $ 500,000 of unreported taxable income in 1986; (2) whether $ 73,000 of cash deposited to petitioner's bank accounts in 1983 constituted unreported taxable income; (3) whether petitioner received unreported taxable *164 income of $ 32,509 from the estate of Arlene Beaucaire in 1983; (4) whether petitioner is entitled to certain claimed deductions for 1983; (5) whether petitioner is liable for additions to tax for negligence or intentional disregard of rules and regulations and for substantial understatement of income tax; and (6) whether the Court should require petitioner to pay a penalty to the United States under section 6673. Unless otherwise indicated, all section references are to the Internal Revenue Code as amended and in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. Some of the facts have been stipulated and are so found. Petitioner resided in Eugene, Oregon, at the time he filed his petition. Our findings of fact and opinion with respect to each issue are combined, and each issue is discussed separately. Issue 1. $ 500,000 of Unreported Income in 1986
As a result of petitioner's conviction in May 1977 of felony drug charges and mail fraud, his license to practice veterinary medicine in the State of California was revoked. See Thorpe v. Board of Examiners in Veterinary Medicine, 163 Cal. Rptr. 382 (Ct. App. 1980). *165 Thereafter, he sold his practice and clinic to Richard Maraziti (Maraziti). A pattern of diverse business transactions between petitioner and Maraziti (in addition to those discussed below) then ensued. In 1982, petitioner inherited an undivided one-sixth interest in the residuary estate of Arlene Beaucaire. On March 22, 1984, petitioner and the other residuary legatees assigned their interests in the residuary estate to the Beaucaire Residuary Beneficiary Trust (Trust). Petitioner sold (through assignments) his interest in the Trust to Maraziti as follows: Date of Assignment
Percent of Interest Assigned
7/18/84
18
9/28/84
18
4/01/85
13
6/15/85
15
8/28/86
36
100
Between 1984 and 1986, Maraziti paid petitioner approximately $ 675,000 for his interest in the Trust. In October 1986, a partial distribution of Trust principal was made to the six beneficiaries. Maraziti (as petitioner's assignee) received $ 625,000 at that time. In November 1986, Maraziti deposited $ 550,000 in a savings account at First Interstate Bank in Chula Vista, California (First Interstate). Sometime thereafter, petitioner offered to sell Maraziti property, which was not identified *166 at trial, at a substantial discount. In anticipation of the purchase of such property, on November 28, 1986, Maraziti withdrew $ 500,000 from his First Interstate account, and in accordance with petitioner's instructions, purchased ten $ 50,000 cashier's checks made payable to petitioner. Maraziti placed the cashier's checks in a newly opened safety deposit box at First Interstate. Unbeknownst to Maraziti, on December 15, 1986, petitioner went to respondent's San Diego, California office and met with Revenue Agent David Simmons (Simmons). Petitioner indicated that he had not filed his 1984 and 1985 income tax returns and that he owed respondent approximately $ 200,000. Additionally, petitioner stated that he would be receiving a large sum of cash from a business associate in a few days and would like respondent to be there to collect the taxes owed. Sometime after his conversation with Simmons, petitioner spoke with Revenue Officer Mark Van Epps (Van Epps) regarding those circumstances in which respondent could seize funds in payment of delinquent taxes. Again, petitioner stated that he had not filed his 1984 and 1985 returns. Petitioner told Van Epps that he wanted respondent *167 to seize the money because an associate had threatened to rob or to physically injure him. Van Epps informed petitioner that if he filed his 1984 and 1985 returns and such returns showed that petitioner owed taxes, then respondent could collect the money after assessment. On the morning of December 17, 1986, petitioner brought his 1984 and 1985 returns to respondent's San Diego office. These returns showed that petitioner owed $ 118,325 for 1984 and $ 116,154 for 1985. After computing interest and additions to tax, an assessment of $ 353,323.76 was made against petitioner. Sometime between November 28, 1986, when Maraziti purchased the cashier's checks, and December 17, 1986, petitioner informed Maraziti that he wanted cash rather than cashier's checks. Maraziti rented a safety deposit box at Central Federal Bank, which was across the street from First Interstate's main headquarters. He placed the cashier's check in the Central Federal Bank safety deposit box. Maraziti then made arrangements with First Interstate to have $ 500,000 in cash available at its main headquarters in San Diego on December 17, 1986. On the afternoon of December 17, 1986, Maraziti and petitioner went *168 to the main headquarters of First Interstate. Maraziti had two of the $ 50,000 cashier's checks with him. There, they met Mr. Ferand (Ferand), the security director of First Interstate. Maraziti released one of the $ 50,000 cashier's checks to Ferand. Ferand told Maraziti that there was room for only four people in the vault: Ferand, petitioner, a security officer, and a teller. Ferand escorted petitioner to the bank vault, and Maraziti was led to a waiting area. A few minutes later, Ferand returned and told Maraziti that he would not assist in the cashing of the checks unless he was able to verify all the checks first. Maraziti then went to his Central Federal Bank safety deposit box and retrieved the other eight checks. He prepared an agreement for petitioner to sign. This agreement stated that the checks were Maraziti's and were not to be cashed. Maraziti gave Ferand the remaining nine checks, stating that they were being tendered for verification purposes only. Ferand told Maraziti that he would verify the checks and return them to him. At the time, Maraziti did not know that petitioner was in the vault. Meanwhile, inside the vault, petitioner cashed the ten $ 50,000 *169 cashier's checks. Van Epps and three agents of respondent's Criminal Investigation Division were also inside the vault. Van Epps presented a billing notice to petitioner. Petitioner gave $ 353,000 in cash to Van Epps and put the remainder of the money in a paper bag. At petitioner's request, Van Epps and the other agents left through a back door and gave petitioner a ride to the Federal Building. When they arrived at the Federal Building, petitioner left with his bag of money. Approximately 1 month later, petitioner filed a claim for a refund for all the money which he had paid to respondent's representative inside First Interstate's vault, except for $ 3,930 which petitioner did not dispute had been properly assessed. Petitioner claims that he and Maraziti executed the assignments of petitioner's interest in the Trust solely to hide the Trust proceeds from petitioner's creditors. Petitioner further claims that Maraziti never paid for the assignments and that the ten $ 50,000 cashier's checks which Maraziti delivered to petitioner represented petitioner's share of the distribution from the Trust. Petitioner contends that Maraziti was to receive a fee for acting as his "straw *170 man". To support his argument, petitioner offered into evidence a copy of an undated memorandum purportedly signed by Maraziti which acknowledged that Maraziti owed petitioner $ 430,000 as payment for petitioner's interest in the Trust. Petitioner did not produce the original memorandum. Generally, to prove the content of a writing, the original is required. Fed. R. Evid. 1002; Rule 143(a). However, a duplicate or copy is admissible to the same extent as an original unless a genuine question is raised regarding the authenticity of the original. Fed. R. Evid. 1001(4), 1003. Respondent disputed the authenticity of the memorandum purportedly signed by Maraziti. Maraziti denied that he signed any memorandum acknowledging he owed petitioner $ 430,000. Thus, the copy of the memorandum is not admissible to the same extent as the original memorandum. Fed. R. Evid. 1003. An original is not required and a copy is admissible if petitioner can satisfactorily explain his failure to produce the original or convince the Court that the memorandum is not closely related to a controlling issue. Fed. R. Evid. 1001(4), 1004. Petitioner did not testify concerning the availability of the original *171 memorandum. In addition, the memorandum is closely related to the issue of whether the $ 500,000 which petitioner received was taxable income. Thus, the copy of the memorandum is not admissible. Fed. R. Evid. 1004. Petitioner was the only witness who testified on his behalf. While petitioner testified, we observed his demeanor and evaluated his credibility. Simply put, we do not believe his version of this bizarre tale. Against the testimony of petitioner was that of Maraziti. His version of what happened was diametric to that of petitioner's. Maraziti was a credible witness; we accept his version. We conclude that petitioner essentially converted $ 500,000 of Maraziti's money and used the Internal Revenue Service to effectuate the conversion. Such ill-gotten gain is taxable to petitioner pursuant to section 61, as respondent determined. Issue 2. $ 73,000 of Unreported Income in 1983
Respondent determined that petitioner realized $ 73,000 of unreported income in 1983 as a result of cash deposited to his bank accounts as follows: $ 60,000 into petitioner's account at First Interstate, $ 10,000 into his account at the Bank of America, and $ 3,000 into his account *172 at Peninsula Bank of San Diego. Petitioner claims he did not have accounts at these banks. He argues in the alternative that the money allegedly deposited into such accounts represents the proceeds of a loan from Maraziti. Again, with regard to this issue, we did not find petitioner's testimony credible. Accordingly, respondent's determination with respect to this issue is sustained. Issue 3. $ 32,509 of Unreported Income in 1983
Respondent determined that petitioner received and failed to report $ 32,509 from the estate of Arlene Beaucaire in 1983. Petitioner admitted that he received income from the estate of Arlene Beaucaire in 1983, but explained that he did not know the amount of the income. Petitioner failed to carry his burden of proving that respondent erred in determining that he received the aforementioned $ 32,509 of unreported income in 1983. Thus, respondent's determination with respect to this issue is sustained. Issue 4. Deductions Claimed For 1983
Respondent disallowed the following deductions claimed for 1983: Business expenses
$ 10,152
Net operating loss
69,130
Attorney's fees
9,440
Taxes
5,839
Interest
5,389
Deductions are *173 a matter of legislative grace. New Colonial Ice Co. v. Helvering, 292 U.S. 435, 440 (1934). A taxpayer must substantiate the amounts which give rise to the claimed deductions, and if he does not, respondent is not arbitrary or unreasonable in denying the deductions. Hradesky v. Commissioner, 65 T.C. 87, 90 (1975), affd. per curiam 540 F.2d 821 (5th Cir. 1976). Petitioner testified that his accountant lost the records which would substantiate his deduction of $ 10,152 for business expenses incurred in connection with a charter boat fishing activity. A taxpayer's inability to produce his records does not relieve him of his burden of proof. Fiqueiredo v. Commissioner, 54 T.C. 1508, 1512-1513 (1970), affd. per order (9th Cir., Mar. 14, 1973). The loss of records does not leave a taxpayer helpless in meeting his substantiation burden. In general, when a taxpayer's records have been lost or destroyed through circumstances beyond his control, he is entitled to substantiate the deductions by reconstructing his expenditures through other credible evidence. Petitioner's accountant did not testify, and petitioner *174 did not offer any evidence (other than his own testimony) to substantiate the claimed business expenses. He thus failed to carry his burden of proving that he is entitled to a $ 10,152 deduction in 1983 for ordinary and necessary business expenses. Petitioner claimed a $ 69,130 net operating loss deduction in 1983. Petitioner explained that he suffered a casualty loss in 1982 which he carried over to 1983. Petitioner failed to produce any substantiation of the amount of the casualty loss. Thus, he has failed to carry his burden of proving that he is entitled to a net operating loss deduction in 1983. Petitioner claimed a $ 9,440 deduction for attorney's fees paid in 1983. To substantiate the deduction, petitioner introduced a copy of a billing statement allegedly from his attorney showing that his attorney was paid a $ 5,000 retainer. The billing statement was not typed on letterhead and contained no indication of who had sent the bill. The first page of the document was dated January 6, 1984. The second page, which contained the reference to the $ 5,000 retainer, was undated and did not appear to be a continuation of the first page. Petitioner failed to introduce into *175 evidence any canceled checks or other receipts showing that he paid attorney's fees in 1983. The billing statement is not adequate substantiation of petitioner's payment of attorney's fees because it fails to show: (1) The attorney's name; (2) the party who paid the retainer; and (3) the year in which the retainer was paid. Accordingly, petitioner failed to carry his burden of proving that he paid $ 9,440 to his attorney in 1983. Petitioner claimed that he paid $ 5,839 in State personal property taxes in 1983. Petitioner introduced a copy of a tax roll which showed four entries for petitioner as follows: Bill Date
Payment Date
Amount
4/20/83
5/13/83
$ 2,829.59
4/20/83
Unknown
122.88
5/05/83
5/13/83
862.35
4/26/84
8/31/84
2,863.61
The tax roll only supports a finding that two of the bills were paid in 1983. Although the tax roll does not demonstrate who made the payment, we accept petitioner's testimony that he paid the taxes. Hence, $ 3,691.94 ($ 2,829.59 plus $ 862.35) is allowable for taxes paid in 1983. Petitioner failed to introduce any evidence in support of the $ 5,389 interest deduction which respondent disallowed. He thus failed to carry his *176 burden of proving that he is entitled to a $ 5,389 deduction for interest. Issue 5. Additions to Tax
Petitioner failed to present any evidence which would show that respondent's determinations of the additions to tax were incorrect. Because we have found that petitioner properly deducted $ 3,691.94 in 1983, no additions shall be attributable to such amount. With respect to all other omissions from income or claimed deductions, petitioner is liable for the additions to tax for negligence or intentional disregard of rules and regulations. If the Rule 155 computation shows that petitioner substantially understated his income tax, then petitioner is liable for an addition to tax for such substantial understatement as well. Issue 6. Section 6673 Penalty
The trial of this case began in Phoenix, Arizona, on February 4, 1991. Petitioner rested his case on the first day of trial. On the second day of trial, petitioner called the Court stating that he was ill. The Court granted petitioner's request to continue the trial. The trial was continued until February 25, 1991, in San Diego. On February 20, 1991, petitioner called the Court and stated that he was receiving *177 treatment in Guadalajara, Mexico, and would not be able to attend the trial in San Diego. The Court informed petitioner that unless it received verification from his physician that petitioner was too ill to travel, petitioner would have to appear in San Diego. Petitioner stated that it was impossible for him to travel, but he would attempt to hire an attorney to appear at the trial for him. On February 21, the Court received a telephone call from an attorney who indicated that he intended to file a notice of appearance on behalf of petitioner as soon as petitioner signed a fee agreement as required by California law. The attorney stated that he intended to move for a continuance on February 25. Neither petitioner nor the attorney appeared on February 25. The trial proceeded without petitioner or his attorney. Section 6673 allows the Court to impose a penalty if it appears that the taxpayer's position in a proceeding is frivolous or groundless, or it appears that the proceeding has been instituted or maintained primarily for delay. Respondent requested that we impose a penalty under section 6673 on the grounds that petitioner maintained this suit primarily for delay. Respondent *178 points to petitioner's request on February 5 for a continuance and petitioner's failure to attend the trial in San Diego. With regard to petitioner's request for a continuance, we granted such request after considering respondent's argument at the time of the request. And with regard to petitioner's failure to attend the trial in San Diego, petitioner's absence did not delay the trial because we held the trial without him. Under these circumstances, and in the exercise of our discretion, we decline to impose a penalty against petitioner under section 6673. Decision will be entered under Rule 155. Footnotes
1. Plus 50 percent of the interest due on the portion of the underpayment attributable to negligence or intentional disregard pursuant to sec. 6653(a)(2). ↩
2. Plus 50 percent of the interest due on the portion of the underpayment attributable to negligence pursuant to sec. 6653(a)(1)(B).↩